IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

NADINE MCCLELLAND                                              PLAINTIFF

V.                              CIVIL ACTION NO. 08-5159

MICHAEL ASTRUE,
Commissioner of Social Security                                DEFENDANT


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Nadine McClelland brings this action pursuant to 42 U.S.C. 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for disability and disability insurance benefits under Title II of the Social Security Act (the Act) and Supplemental Security Income under Title XVI of the Act.  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. 405(g).

## Procedural Background

Plaintiff protectively filed her application for a period of disability and disability insurance benefits on May 20, 2004. (Tr. 48).[1]  Plaintiff also protectively filed an application for Supplemental Social Security Income.[2]  (Tr. 11).  The application alleged a disability onset date

---

[1]The court notes that the ALJ, Plaintiff and Defendant give different dates of the filing of the application - May 5, 2004 and May 25, 2004.  A review of the record indicates that the application and appointment date was May 20, 2004 (Tr. 44, 48).

[2]The SSI application does not appear in the record but is referred to by the ALJ in his decision. (Tr. 11).

-1-

of May 27, 2003. (Tr. 48). Following denials at the initial and reconsideration levels, a hearing was held on June 6, 2006, before Administrative Law Judge William H. Manico (ALJ) (Tr. 203-249). At the hearing, the alleged onset date of disability was amended to August 27, 2003, the date of Plaintiff's automobile accident. (Tr. 209-210). On November 22, 2006, Judge Manico issued a decision denying disability. (Tr. 11-18). On June 2, 2008, the Appeals Council denied Plaintiff's request for review. (Tr. 3-5).

In his written decision, the ALJ found that the Plaintiff: met the insured status requirements of the Act; has not engaged in substantial gainful activity since August 27, 2003; has severe impairments of status post left knee arthroscopy and right shoulder pain secondary to rotator cuff tendinosis; does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1; has the residual functional capacity (RFC) to occasionally lift and/or carry 20 pounds, frequently lift and/or carry10 pounds, and push and/or pull within the limits given for lifting and/or carrying; is able to stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday and to sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; is unable to reach overhead or to reach behind the back with the right dominant arm; and must be free, when seated, to rest one foot upon the other at will. (Tr. 13-14). In making the findings, the ALJ stated that he considered all symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, as well as opinion evidence, in accordance with the applicable law. (Tr. 14).

**Evidence Presented**

Plaintiff was forty-five years old at the time of the hearing in 2006 and received her GED.

(Tr. 203).  She began having left knee problems in early 2002 and on March 5, 2002, Dr.

Christopher A. Arnold, her treating physician, diagnosed her with patellofemoral chondrosis.

(Tr. 154).  On March 11, 2002, an MRI was done of Plaintiff's left knee at the request of Dr.

Arnold.  (Tr. 100).  On April 19, 2002, Dr. Arnold performed arthroscopic surgery on Plaintiff's

left knee at the Arkansas Surgery Center.  (Tr. 101).  The postoperative diagnosis was: (1) left

knee, chondral defect, patella; and (2) anteromedial synovitis. (Tr. 101).  Plaintiff followed up

with Dr. Arnold on April 30, 2002, and he concluded that she should start a formal therapy

program. (Tr. 151).  An ultrasound of Plaintiff's left leg was done on May 6, 2002, at the

Northwest Medical Center and there was no evidence of deep venous thrombosis of the left leg.

(Tr. 103).  When Plaintiff followed up with Dr. Arnold on May 28, 2002, he noted that she was

doing well with some residual stiffness and quad atrophy.  (Tr. 150).  Subsequent follow-ups

with Dr. Arnold indicated that Plaintiff was slowly improving, that her knee was getting better

and she was happy.  (Tr. 148,149).

On October 21, 2002, Plaintiff was seen by Dr. Arnold and she indicated that she fell at a

ball game the prior Saturday and landed on her knee.  (Tr. 147).  During a follow-up visit to Dr.

Arnold on December 12, 2002, although Plaintiff was feeling better, she was having more pain in

the pes region. (Tr. 146).  Dr. Arnold wanted to start Plaintiff on a good quad and hamstring

program and offered her an injection, to which Plaintiff agreed.  (Tr. 146).  Dr. Arnold gave

Plaintiff another injection in her knee during her visit to his office on March 13, 2003.  (Tr. 145).

On May 29, 2003, Dr. Arnold stated that Plaintiff needed to work on her quadriceps, continue her

anti-inflammatories and use a knee sleeve.  (Tr. 143).  A medical imaging report dated August

23, 2003, indicated no radiographic evidence of trauma and the osseous and soft tissue densities

were normal.  (Tr. 128).

On September 11, 2003, Plaintiff presented herself to Dr. Arnold with a new problem - she was involved in a motor vehicle accident on August 27, 2003 - her left knee hit the dash and her right shoulder was jammed.  (Tr. 142).  An MRI of the right shoulder was done at the office of Northwest Arkansas Radiology Associates on September 12, 2003, and Dr. David J. Harris found that there was suspraspinatus tendinosis; no full thickness rotator cuff tendon tear identified; no significant joint effusion and no pathologic marrow signal intensity change noted.  (Tr. 160).  During a follow-up visit to Dr. Arnold's office on September 15, 2003, to discuss the MRI of the right shoulder, Plaintiff indicated that she continued to have right shoulder pain.  (Tr. 141).  On October 2, 2003, Dr. Arnold noted that Plaintiff's right shoulder was doing well after a cortisone injection but Plaintiff continued to have pain in her left knee.  (Tr. 140).

An MRI was again done on the left knee on October 2, 2003, by Dr. Michael W. Penney at the Northwest Arkansas Radiology Associates, P.A. (Tr. 158).  It was noted that there was moderate chondromalacia patella with partial thickness articular cartilage loss involving the inferior patellar cartilage;  a small knee effusion and mild osteoarthritic changes involving the medial and lateral femoral compartments of the left knee, but  no evidence of a fracture.  (Tr. 158).  On October 16, 2003, Dr. Arnold noted that the MRI of Plaintiff's left knee showed some chondromalacia patella and the first Supartz was injected in her left knee.  (Tr. 138).  Thereafter, Plaintiff had three additional Supartz injections in her knee. (Tr. 135-137).

On February 6, 2004, a second arthroscopic surgery was performed by Dr. Arnold on Plaintiff's left knee.  (Tr. 108).  Dr. Arnold found that Plaintiff's current symptoms were similar to those that she had prior to her left knee arthroscopy, which did well.  (Tr. 110).  On February

-4-

13, 2004, in a report of a follow-up visit, Dr. Arnold noted that Plaintiff was doing well and had no complaints. (Tr. 132). A medical imaging report dated March 4, 2004, from Washington Regional Medical Center indicated that the deep veins of the left lower extremity from the common femoral through the popliteal vein were normal with normal compressibility and augmentation. (Tr. 127). When Plaintiff visited Dr. Arnold on March 4, 2004, he stated that her knee was doing very well after surgery but that Plaintiff complained of some shoulder pain. (Tr.131). He further noted that he did discuss with Plaintiff that there is some underlying post-traumatic arthrosis and that the pain may stick around in her knee. (Tr. 131).

With respect to her shoulder, Dr. Arnold stated that Plaintiff initially did well with a subacromial injection and wanted her to get back on some exercises. (Tr. 131). When Plaintiff again visited Dr. Arnold on April 15, 2004, he reported that Plaintiff thought the knee was getting better but that the shoulder was worse, noting that the initial injection in the shoulder in the past helped to some degree. (Tr. 130). Dr. Arnold stated that the knee was still not 100% and that Plaintiff was unable to do formal therapy secondary to cost issues. He concluded - "I recommended continuing with the E-Stim, isometric quads and seeing how she does. If it is not better, we will need to make sure she gets formal therapy. I offered this to her today but she wants to hold off." (Tr. 130). During this visit, Dr. Arnold gave Plaintiff a shoulder injection. On June 6, 2004, Plaintiff visited Dr. Arnold for a follow-up and Plaintiff stated that the knee was feeling better and that it was better than it was before the surgery, as well as from her last visit. (Tr. 129). Additional exercises were given to Plaintiff. Plaintiff complained of increased pain about her shoulder and Dr. Arnold stated that he wanted Plaintiff to have a neurological evaluation. (Tr. 129).

On July 9, 2004, Dr. Ryan L. Kaplan of the Neurological Associates examined Plaintiff and concluded that the exam was normal and that there was no evidence of a cervical radiculopathy or brachial plexopathy on the right side and that there was no evidence of a right upper extremity mononeuropathy. (Tr. 161). An MRI of Plaintiff's Brachial Plexus was performed on July 12, 2004, by Dr. Larry C. Graham, and there was no evidence of any pathologically enlarged adenopathy. (Tr. 156). The alignment of the cervical spine was found to be normal. (Tr. 156). An MRI of the cervical spine was performed by Dr. David A. Davis on July 12, 2004, and it was found that the study of the cervical spine at C5-6 showed mild annular bulging "which does not appear to involve neural elements." (Tr. 164). In his letter to Dr. Arnold dated July 27, 2004, Dr. Kaplan stated that there was no evidence of a lesion of the brachial plexus or the cervical spine as per the MRI. (Tr. 163). He suspected that Plaintiff did have an ulnar mononeuropathy at the elbow. (Tr. 163).

On August 25, 2004, a medical consultant, Ronald M. Crow, DO, completed the Residual Functional Capacity Assessment. (Tr. 165-172). He found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, had unlimited ability to push and/or pull, other than as shown for lift and/or carry, and found no postural limitations. (Tr. 166-167). He further found that no manipulative limitations, visual limitations, communicative limitations or environmental limitations were established. (Tr.168-169). Dr. Crow concluded that Plaintiff's symptoms were attributable to a medically determinable impairment and that the severity or duration of the symptoms were disproportionate to the expected severity or expected duration of the Plaintiff's

medically determinable impairments.  (Tr. 170).[3]

      In a Clinic Note dated October 26, 2004, Dr. Arnold stated that he believed that Plaintiff's knee pain would get better when her quad strength returned and that her right shoulder pain was getting better.  (Tr. 197).  On October 28, 2004, Plaintiff saw Dr. Peter Tang from the Arkansas Orthopaedic Hand Center.  (Tr. 175).  Upon physical examination, Dr. Tang found that Plaintiff had full range of motion of her elbow and forearm and that she had "a good grip."  (Tr. 175).  X-rays of her right elbow and right wrist were normal, and he noted the annular bulging at C5-6 of the cervical spine.  Dr. Tang's assessment was that Plaintiff probably had some irritation of the ulnar nerve at the elbow, but that her nerve conduction studies were normal.  (Tr. 176).  He found that Plaintiff had good strength distally, that there was no evidence of atrophy, and no recommendation of surgery was warranted at that time.  (Tr. 176).  Dr. Tang treated her conservatively with a night extension splint and soft elbow padding to allow the ulnar nerve to rest and improve.  (Tr. 176).

      On February 17, 2005, Dr. Arnold noted that Plaintiff was doing very well after the arthroscopic surgery of the knee.  (Tr. 196).  No weakness and no range of motion limitations or instability was noted.  With respect to her right shoulder pain, he noted that her shoulder was doing fine.  (Tr. 196).  On March 25, 2005, Plaintiff received injections in her left knee for pain and right shoulder for pain,  (Tr. 195) and on June 23, 2005, Dr. Arnold noted that Plaintiff continued to have shoulder and knee pain, with the shoulder being the worst.  (Tr. 193).  Dr. Arnold stated that Plaintiff had been worked-up extensively by Dr. Kaplan and Dr. Tang, and there was "no neurological deficit noted by their reports."  (Tr. 193).  He recommended that

_____

[3]Dr. Linda Green affirmed Dr. Crow's assessment on January 11, 2005.  (Tr. 172).

Plaintiff continue with her exercises, over-the-counter anti-inflammatories, glucosamine and avoid irritating activities.  (Tr. 193).  He also believed that Plaintiff would be a good candidate for viscosupplementation on her knee.  (Tr. 193).

On July 12, 2005, another MRI was taken of Plaintiff's right shoulder and it was found that there was fraying of the superior labrum, suggesting a slap tear, but there was no evidence of a rotator cuff tear.  (Tr. 194).  On September 8, 2005, Plaintiff received injections for pain by Dr. Arnold in her shoulder and left knee. (Tr. 187).  On November 8, 2005, Dr. Arnold noted that Plaintiff had shoulder pain and that he believed the next step was to scope the shoulder. However, he wanted to give her 6 months to do some home exercises.  (Tr. 186).  Dr. Arnold also found that Plaintiff had done well with viscosupplementation on the left knee.  (Tr. 186).

On January 12, 2006, Dr. Arnold stated that Plaintiff was having increased pain about her right shoulder and left knee and gave Plaintiff an injection in her right shoulder.  He wanted her to get back to see Dr. Kaplan and although he thought her knee would have to be scoped again, he stated that he wanted to take care of the shoulder first.  (Tr. 185).

On March 10, 2006, Dr. Robert C. Thompson, of the Complete Orthopaedics & Sports Medicine Center, conducted a Social Security Examination of the Plaintiff.  (Tr. 177-179). According to Dr. Thompson's report, the physical exam showed that Plaintiff had a normal range of motion of the upper extremities, with a lightly reduced external rotation of the right shoulder by-5.  (Tr. 177).  Dr. Thompson found that the internal rotation of the shoulder was "normal but she refuses to bend her elbow enough to put her hand behind her back.  It can be seen that it will easily go.  This is sort of an aberrant response to the request."  (Tr. 177). He found that Plaintiff walked with a normal gait both forward and backward and that lateral bending was normal.

(Tr.177). However, when she bent to one side, Plaintiff said she could not bend any further because her arm was getting numb. Dr. Thompson knew of no biological connection between those two activities. (Tr. 177). X-rays of the cervical spine and lumbar spine were normal (Tr. 178) and Dr. Thompson noted that Plaintiff appeared to have a slight reduction of extension and flexion of her left knee. (Tr. 177). Dr. Thompson concluded: "The patient may well have some degree of multiple pain discomfort, but objective evidence is lacking from an orthopedic point of view." (Tr. 179).

On April 18, 2006, Plaintiff saw Dr. Arnold and he gave her injections in her right shoulder and left knee. He noted that Plaintiff had still not seen a neurologist and was waiting for insurance coverage. (Tr. 183).

**Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. <u>Ramirez v. Barnhart</u>, 292 F.3d 576, 583 (8th Cir.2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. <u>Edwards v. Barnhart</u>, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the

ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § §423(d)(1)(A), 1382c(a)(3)(A).  The Act defines 'physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C.§§423(d)(3), 1382(3).  A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience.  See 20 C.F.R.  416.920, 404.1520.  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity.  See McCoy v. Schwieker, 683 F.2d 1138,1141-42 (8th Cir. 1982); 20 C .F.R.  416.920, 404.1520.

**Discussion**

Plaintiff contends that the ALJ erred in concluding that she was not disabled. Specifically,

Plaintiff alleges that the ALJ wrongfully discredited her allegations of disabling pain by concluding that there was a lack of objective medical evidence.

**A. Subjective Complaints and Credibility Analysis:**

The ALJ is required to consider all of the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984). As the United States Court of Appeals for the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

In disability determinations, credibility assessments are the province of the ALJ. Onstead v.Sullivan, 962 F.2d 803, 805 (8th Cir. 1992). This court will not substitute its judgment for that of the trier of fact, Brown v. Chater, 87 F. 3d 963, 966 (8th Cir. 1996), nor will we disturb the decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id.

Plaintiff asserts that there is ample medical evidence relating to her right shoulder pain and that the ALJ gave great weight to a consultative orthopedic examination performed by Dr. Robert Thompson on March 10, 2006. However, as set forth above and further discussed below,

-11-

there is a substantial amount of other medical evidence to support the ALJ's findings relating to his conclusions regarding Plaintiff's allegations of pain.

In Plaintiff's Function Report dated August 17, 2004, Plaintiff stated that all of the heavy housework and outside work was done by her husband and that she does housework a little bit at a time.  (Tr. 64).  Plaintiff further indicated in the report as well as at the hearing before the ALJ that she runs errands (but pays for it with pain and less sleep), reads and watches TV on a daily basis, and that crutches and a brace were previously prescribed by the doctor but that she "very seldom needs to use them." (Tr. 64,70,228).  Plaintiff testified at the hearing that she could not hold a cup of coffee, open or shut a door or reach above her head or around her back.  She stated that she has no lifting ability with the right arm by itself (Tr. 219-220).

An MRI of the shoulder on September 12, 2003, showed no rotator cuff tear, no significant joint effusion and no pathologic marrow signal intensity change was noted.  (Tr. 160). Plaintiff received several injections in her right shoulder by Dr. Arnold, with some success. (Tr. 130, 140,185, 187).  Dr. Ryan L. Kaplan, from Neurological Associates, found no evidence of a cervical  radiculopathy or brachial plexopathy on the right side and no evidence of a right upper extremity mononeuropathy.  (Tr. 161).  He also advised Dr. Arnold by letter of July 27, 2004, that there was no evidence of a lesion of the brachial plexus or the cervical spine and based upon his neurologic exam, he suspected that she did have an ulnar mononeuropathy at the elbow.  (Tr. 163).  A MRI of Plaintiff's cervical spine indicated a mild annular bulging of the cervical spine at C5-6, but it did not appear to involve neural elements.  (Tr. 164).  Dr. Peter Tang found that Plaintiff had a full range of motion of her elbow and forearm and that she had "a good grip."  (Tr. 175).  He also noted that the X-rays of right elbow and right wrist were normal, that she had good

strength distally and no evidence of atrophy, and that no recommendation of surgery was warranted at that time. (Tr. 176).   He treated her conservatively with a night extension splint and soft elbow padding to allow the ulnar nerve to rest and improve.  (Tr. 176).  On February 17, 2005, Dr. Arnold noted that Plaintiff's right shoulder pain was doing fine. (Tr.196).  When Dr. Arnold saw Plaintiff on September 8, 2005, her shoulder pain recurred and she received an injection, with Dr. Arnold wanting to give her six months to do home exercises. (Tr. 187).

With respect to Plaintiff's knee, she has had two arthroscopic surgeries conducted on her left knee by her treating physician, Dr. Arnold.  (Tr.101, 108).  Crutches and a brace were prescribed for Plaintiff prior to August 17, 2004, but she very seldom needed to use them.  (Tr. 64).  On follow-up visits to Dr. Arnold, he found Plaintiff's knee was doing well and getting better, (Tr.132, 131, 130, 129,196, 193) and did well with viscosupplementation (Tr. 186).  Dr. Arnold noted on January 12, 2006, that Plaintiff was having increased pain and may require another athroscopic surgery.  (Tr. 184-185).  Plaintiff had also been prescribed Hydocodone as needed for pain and Temazepan for sleep, with no side effects.  (Tr. 77).

The ALJ, after consideration of the entire record, found that Plaintiff's impairment did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d) 416.925 and 416.926).  (Tr. 13). The ALJ noted that although the Plaintiff described limited daily activities, he believed that those limited activities could not be objectively verified with any reasonable degree of certainty. (Tr. 16).  He further stated that even if Plaintiff's activities were as limited as alleged, it was difficult to attribute that degree of limitation to the Plaintiff's medical condition, as opposed to other reasons, in view of the medical evidence and other factors discussed in the decision.  (Tr.

-13-

16).  The ALJ concluded that Plaintiff's limited daily activities were outweighed by the other factors discussed in the decision.  (Tr. 16).  Although Plaintiff may suffer with some degree of pain, she has not established that she is unable to engage in any gainful activity.  See Craig v. Apfel, 212 F. 3d 433,436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); Woolf v. Shalala, 3 F. 3d 1210, 1213 (8th Cir. 1993) (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).

It is clear from his decision that the ALJ seriously considered Plaintiff's complaints of disabling pain.  In addition, the ALJ adequately evaluated the factors set forth in Polaski v.Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).   Considering the record as a whole, the court concludes that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints and statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible.

**B.  RFC Assessment:**

It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence."  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000).  The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," Singh v. Apfel, 222 F.3d 448, 451(8th Cir. 2000), and thus, "some medical evidence," Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace."  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  Therefore, in evaluating the

-14-

plaintiff's RFC,  while not limited to considering medical evidence, an ALJ is required to

consider at least some supporting evidence from a professional.  Cf. Nevland v. Apfel, 204 F.3d

at 858;  Ford v. Secretary of Health and Human Services, 662 F. Supp. 954, 955, 956 (W.D.Ark.

1987) (RFC was "medical question," and medical evidence was required to establish how

claimant's heart attacks affected his RFC).  In the present case, the ALJ considered the medical

assessments of examining agency medical consultants, Plaintiff's subjective complaints, and her

medical records.  Plaintiff's capacity to perform this level of work is supported by the fact that

Plaintiff's treating and examining physicians placed no restrictions on her activities that would

preclude performing the RFC determined.  See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir.

1999)(lack of physician-imposed restrictions militates against a finding of total disability).

Based on the record as a whole, the court finds substantial evidence in the record to support the

ALJ's RFC determination.

**C.  Hypothetical Question**

At the hearing before the ALJ on June 6, 2006, the ALJ posed a hypothetical to Ms. Patty

Kent, the vocational expert (VE).  (Tr. 231).  He asked the VE to assume a claimant is 45 years

old and has a GED, whose past work has been that of a receiving clerk and buyer's assistant.  He

asked the VE to also assume a claimant is limited to light work, which would require her to

occasionally lift or carry 20 pounds frequently, lift or carry 10 pounds, stand and or walk with

normal breaks for a total of about six hours in an eight-hour work day, sit with normal breaks for

a total of about two hours in an eight-hour work day and push and or pull within those limits of

light work.  The ALJ further asked the VE to assume that the claimant cannot reach behind her

back with her right hand or right arm and could not reach overhead with the right arm and that

claimant needed to avoid exposure to heights.  (Tr. 233).  In response, the VE stated that the

claimant could work as a kitchen helper and a cashier.(Tr. 233).  When the ALJ asked the VE to

change the exertional level to sedentary, where the claimant could only be on her feet for no

more than 15 minutes at a stretch and be able to support one foot over the other, the VE stated

that the person could perform duties of a surveillance system monitor and general unskilled

office type work. (Tr. 236-237).  The ALJ also took into account certain limitations that were

alleged by the Plaintiff when presenting the VE with hypotheticals , even though not necessarily

supported by the evidence.  Even then, the VE found jobs that Plaintiff would be able to perform.

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the

court finds that the hypothetical the ALJ posed to the VE fully set forth the impairments which

the ALJ accepted as true and which were supported by the record as a whole. See Goff v.

Barnhart, 421 F.3d 785,794 (8th Cir. 2005).  Accordingly, the court finds that the VE's testimony

constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments do

not preclude her from performing the work of a kitchen helper, cashier, surveillance system

monitor or general unskilled office work.  Pickney v. Chater, 96 F.3d 294, 296 (8th Cir.

1996)(testimony from vocational expert based on properly phrased hypothetical question

constitutes substantial evidence).

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial

evidence supporting the ALJ's decision denying the Plaintiff benefits, and recommends affirming

the decision of the ALJ.  **The parties have ten days from receipt of our report and**

**recommendation in which to file written objections pursuant to 28 U.S.C. 636(b)(1).  The**

-16-

**failure to file timely objections may result in waiver of the right to appeal questions of fact.**

**The parties are reminded that objections must be both timely and specific to trigger de**

**novo review by the district court.**

Dated this 29th day of October, 2009.


/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE